IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SHARING SERVICES GLOBAL | § | |
| CORPORATION f/k/a | § | |
| SHARING SERVICES, INC., | § | |
| ELEPRENEURS HOLDINGS, LLC | § | |
| n/k/a ELEVACITY HOLDINGS, LLC, | § | |
| ELEPRENEURS U.S., LLC | § | |
| n/k/a ELEVACITY U.S., LLC, | § | |
| SHRG IP HOLDINGS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 4:21-cv-00183-SDJ |
| | § | |
| AMPLIFEIINTL, LLC d/b/a HAPINSS, | § | |
| and HAPINSSBRANDS LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THE COURT:

Plaintiffs Sharing Services Global Corporation f/k/a Sharing Services, Inc., Elepreneurs Holdings, LLC n/k/a Elevacity Holdings, LLC, Elepreneurs U.S., LLC n/k/a Elevacity U.S., LLC, and SHRG IP Holdings, LLC file this First Amended Complaint against Defendants AmplifeiIntl, LLC d/b/a HAPInss and HAPInssBrands LLC.

## NOTICE OF COLLATERAL PROCEEDINGS

1.     Pursuant to Eastern District of Texas Local Rule CV-42(a), Plaintiffs hereby notify the Court that this case involves or may involve subject matter(s) that either comprise(s) all or a material part of the subject matter(s) or operative fact(s) of other action(s) and/or involve(s) all of some of the same parties in other cases presently pending in the Eastern District of Texas, to wit:

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 1 of 65

A.     Case No. 4:21-cv-00026-ALM, *Elepreneurs Holdings, LLC d/b/a Elepreneur, LLC, et. al. v. Lori Ann Benson, et. al.*, Eastern District of Texas, Sherman Division, filed in state court on December 31, 2020, and removed to the Eastern District of Texas on January 13, 2021 (District Judge Amos L. Mazzant, III presiding) ("Benson Matter");

B.     Case No. 4:20-cv-00989-SDJ, *Sharing Services Global Corporation, et. al. v. Robert Oblon*, Eastern District of Texas, Sherman Division filed on December 31, 2020 and presently stayed (District Judge Sean D. Jordan presiding) ("Oblon Matter"); and

C.     Case No. 4:20-cv-00946-SDJ, *Dennis Burback, et. al. v. Robert Oblon, et. al.*, Eastern District of Texas, Sherman Division filed on December 11, 2020 (District Judge Sean D. Jordan presiding) ("Burback Matter").

## SUMMARY OF CLAIMS

2.     Plaintiffs bring this action against Defendants for unfair competition under both federal law and state law, common law trademark infringement, tortious interference with Plaintiffs' existing contracts and business relationships, common law and Texas statutory misappropriation of trade secrets.

## PARTIES, JURISDICTION AND VENUE

3.     Plaintiff Sharing Services Global Corporation ("Sharing Services") is a Nevada corporation with its principal office in Plano, Collin County, Texas.   Plaintiff Sharing Services is a citizen of Nevada and Texas.

4.     Plaintiffs Elepreneurs Holdings n/k/a Elevacity Holdings, LLC ("Elepreneurs Holdings") and Elepreneurs U.S., LLC n/k/a Elevacity U.S., LLC ("Elepreneurs U.S."), and SHRG IP Holdings, LLC ("SHRG IP") are Texas limited liability companies with their principal offices in Plano, Collin County, Texas.  Plaintiffs Elepreneurs Holdings, Elepreneurs U.S., and SHRG IP are citizens of Texas.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 2 of 65

5.      Defendant AmplifeiIntl, LLC d/b/a HAPInss ("Amplifei") is a Texas limited liability company with its principal office in Frisco, Collin County, Texas.  Defendant Amplifei is a citizen of Texas.

6.      Defendant HAPInssBrands LLC ("HAPInss") is a Texas limited liability company with its principal office in Frisco, Collin County, Texas.  Defendant HAPInss is a citizen of Texas.

7.      This Court has original jurisdiction over this proceeding pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338 because it concerns a Lanham Act claim and a trademark.  This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367(a) because this court has original jurisdiction over the federal claims asserted in this matter and because any/all other claims asserted in this matter are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

## FACT ALLEGATIONS REGARDING THE WRONGFUL CONDUCT OF DEFENDANTS AND THEIR AGENTS

9.      Sharing Services is a public company, traded on the OTCQB platform administered by the OTC Markets Group, under the symbol of "SHRG". Sharing Services does business by and through various subsidiaries and affiliates including Plaintiffs Elepreneurs Holdings, and Elepreneurs U.S., and SHRG IP.

10.      Plaintiff Elepreneurs Holdings is the parent company of Plaintiff Elepreneurs U.S. Plaintiff Elepreneurs U.S. markets and sells various nutritional supplements and skin care products throughout North America and certain foreign countries.

11.      This is an organizational chart depicting the relationship of the Plaintiff parties:



12.     Plaintiff SHRG IP is the owner of valuable common law trademarks which are the subject of the following trademark registration applications pending with the United States Patent and Trademark Office ("USPTO"):

| Trademark | Serial Number |
|---|---|
| THE HAPPY CO™ | 90/191743 |
| THE HAPPINESS COMPANY™ | 90/009505 |
| THE HAPPY COMPANY. LIFE. ELEVATED.™ | 90/373203 |
| THE HAPPY BLEND™ | 90/393210 |
| THE HAPPY ORIGINAL™ | 90/393132 |
| HAPPINESS IN A CUP™ | 90/393462 |
| THE ORIGINAL HAPPY CO.™ | 90/393358 |
| THE HAPPY UNIVERSE™ | 90/393666 |
| THE ORIGINAL HAPPY COMPANY™ | 90/393733 |
| THE ORIGINAL HAPPI COMPANY™ | 90/393810 |
| THE ORIGINAL HAPI COMPANY™ | 90/393917 |
| HEMPLEVATE™ | 88/754316 |
| "LIFE.ELEVATED."™ | 90/330285 |
| ELEVATE SMART COFFEE™ | 88/176803 |
| UNWINED™ | 90/189456 |
| ELEVATE PINK POWER™ | 88/441942 |

| Trademark | Serial Number |
|---|---|
| ELEVATE MAX + ™ | 90/369308 |
| HAPPY COFFEE ™ | 90/534878 |
| ORIGINAL ELEVATE COFFEE ™ | 90/534890 |
| ORIGINAL SMART COFFEE ™ | 90/534907 |
| ORIGINAL ELEVATE SMART COFFEE ™ | 90/534917 |
| H CO. ™ | 90/497932 |
| ALL-IN-ONE HAPPY SHAKE ™ | 90/497828 |
| ELEVATE MAX GOLD COAST ™ | 90/609492 |
| GOLD COAST ENERGY CAPS ™ | 90/609420 |
| GOLD COAST HAPPY COFFEE ™ | 90/609384 |
| RELAX. RECHARGE. REVIVE. ™ | 90/373290 |
| LIFE.ELEVATED. ™ | 90/360617 |
| H CO. ™ | 90/505203 |
| ELEVACITY GLOBAL ™ | 88/217331 |
|  ™ | 88/260389 |
| ELEVATING ENTREPRENEURS ™ | 88/571279 |
| ELEVACITY GLOBAL ™ | 88/976698 |
|  ™ | 90/681258 |
| HAPI TRAVEL DESTINATIONS ™ | 90/681135 |
| LIFE. ELEVATED. ™ | 90/360617 |
| ELEPRENEURS ™ | 88/116396 |

13.     Plaintiff SHRG IP is also the owner of other valuable common law trademarks, most notably for purposes of this First Amended Complaint, Elevate Smart Coffee™.

14.     Plaintiff SHRG IP is also the owner of valuable federal trademark registrations issued by the USPTO, including:

| Trademark | Registration Number |
|---|---|
| ELEVATE MAX ® | 6,189,567 |
| ELEVATE PURE 2.0 ® | 5,979,183 |
| ELEVATE ZEST ® | 6,069,001 |
| ELEVATE NITRO ® | 6,121,900 |
| ELEVATEPINK ® | 6,031,961 |
| *elevatepink* ® | 6,031,960 |
| ELEVACITY® (standard characters) | 5,734,085 |
| elevAcity ® | 5,734,086 |
| CHOCLEVATE® | 5,734,042 |
| XANTHOMAX® | 5,734,043 |
| KETŌCRÉ® | 5,734,044 |
| DŌSE ® | 5,734,087 |
| ® (Elepreneurs Triangle Logo) | 5,888,818 |
| ® (Elevacity Triangle Logo) | 5,921,135 |
| ELEVATE PURE 2.0 ® | 5,979,183 |
| ELEAPP® | 6,069,429 |
| ELEAPP® (STYLIZED LOGO) | 6,069,430 |
| ELEVACITEA® | 6,151,522 |

15.     Plaintiff Sharing Services (SHRG) is the owner of the following valuable federal trademark registrations issued by the USPTO: (1) ⑤® (Sharing Services interlocking S logo) with Registration No. 6,016,347; and (2) SHARING SERVICES® with Registration No. 6,016,346.

16.     All of the foregoing trademarks identified in Paragraphs 12, 13, 14 and 15 above ("Marks") constitute the valuable intellectual property of Plaintiffs.

17.     SHRG IP licenses its rights in the Marks and other intellectual property to Elepreneurs Holdings and Elepreneurs U.S. pursuant to a royalty based, license agreement.

18.     Plaintiff Elepreneurs U.S. utilizes the Marks in connection with the sale of a nutritional supplement product line marketed under the trade name Elevacity ("Elevacity Product

First Amended Complaint – Case No. 4:21-cv-00183-SDJ

*Sharing Services Global Corporation et al. vs.
AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 6 of 65

Line").  The overarching focus of the Elevacity Product Line is to promote the health, wellness, and happiness of the consumers of these products.[1]

19.    The proprietary formulae of the Elevacity Product Line ("Product Formulations") are licensed by Plaintiffs from Alternative Laboratories, LLC ("Alt Labs"), pursuant to that certain "Manufacturing and Supply Agreement" dated August 27, 2018, as amended ("MSA").  Plaintiffs have valuable intellectual property, trade secret, and contract rights in these Product Formulations by virtue of: (i) Plaintiffs' status as a licensee under the MSA, and (ii) the periodic, active collaboration of Plaintiffs' management executives with Alt Labs in the development of these Product Formulations (collectively, the "Trade Secret Rights").

20.    Plaintiff Elepreneurs U.S. markets and sells a wide array of nutritional supplement and skin care products under the Elevacity Product Line.  In the marketing and selling of the Elevacity Product Line, Plaintiff Elepreneurs U.S. has employed, utilized and undertaken diligent efforts to protect the trade dress, trade names, branding indicia and goodwill associated with these products and the conduct of its business operations ("Branding Indicia").

21.    Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have diligently initiated efforts to protect the Branding Indicia, including, but not limited to: (i) the creation of a separate intellectual property holding company, Plaintiff SHRG IP, and (ii) the creation, implementation and on-going management of a trademark, copyright and trade secret protection initiative which includes the prosecution of a trademark registration program for a variety of trademarks and service marks associated with the Elevacity Product Line, as well as various marketing and branding slogans, logos and composite marks.

---

[1] With the exception of the Elevacity skincare products, these products are also generically referred to as "nutraceuticals" as well as "nootropics."

22.     The foregoing efforts have resulted in 19 trademarks receiving registration status with the USPTO on the Principal Register, the submission of another 37 federal trademark registration applications (which are pending before the USPTO), and the creation of a common law designation policy for all non-registered trademarks and service marks utilized in Plaintiffs' business operations. All of these trademarks are the subject of a license agreement between SHRG IP and various of the Plaintiffs.

23.     Further, as part of an ongoing program to protect the integrity of Plaintiffs' Branding Indicia and intellectual property portfolio, Plaintiffs also pursued the development of comprehensive non-disclosure and confidentiality protocols, which mandates, among other things, the execution of a Non-Disclosure Agreement ("NDA") by all parties engaged in actual and potential commercial transactions by various of the Plaintiffs.

24.     Also, SHRG IP, through the assistance of outside legal counsel, consistently engages in efforts to protect its trademark/service mark portfolio by "policing the marketplace" which involves the periodic monitoring in the public record (USPTO and otherwise) of potential and actual infringement on its trademark/service mark portfolio, the issuance of "cease and desist" letters and the commencement, from time to time, of infringement litigation against transgressors.

25.     In addition to the foregoing, SHRG IP in conjunction with the other Plaintiffs instituted a copyright protection review process which mandates the inclusion of Federal copyright law compliant notices on all publications, websites, product labels, and marketing materials.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 8 of 65

26.     The Elevacity Product Line products are marketed and sold to the general public by means of the Elepreneurs' website and a system of independent contractor "distributors;" and is also marketed to the general public through its website www.thehappyco.com.[2]

27.     Robert Oblon ("Oblon") was involved in the founding of the company (called at the time "Elepreneurs"), which became Elepreneur, LLC, on March 13, 2019.  Oblon was the initial Chief Executive Officer ("CEO") of Elepreneur, LLC and remained in that position until the time of his resignation from all relationships with Plaintiffs' then existing various business entities in April 2019.[3]  In March and June of 2020, respectively, Oblon founded Defendants Amplifei and HAPInss.  On January 24, 2020, prior to creating each of the Defendant LLC entities, Oblon began operating (and continues to operate) a website at www.hapinss.com.

---

[2]  Three other websites (www.elepreneurs.com, www.elepreneur.com and www.elevacity.com) have been utilized by Plaintiff, Elepreneurs U.S. and other Plaintiffs, in connection with their operations. These sites either show the content of or now re-direct to www.happyco.com and www.sharethehappyco.com.

[3]  Oblon's resignation and separation from all relationships with Plaintiffs, and related entities, did not occur simply. The minute details of the resignation circumstances are not germane to Plaintiffs' claims in this case. However, by way of background information and for context purposes, after many tumultuous weeks during January – March 2019, Oblon's relationship with the Plaintiffs fundamentally changed. On February 4, 2019, Oblon resigned from Plaintiff Sharing Services' Board of Directors. On March 28, 2019, in exchange for Oblon's agreement to transition out of all officer, employee, and management positions, Elepreneur, LLC (which a short time later by name change became Plaintiff Elepreneurs U.S.) entered into a "Founders Agreement" with Oblon which provided substantial monthly payments to Oblon in recognition of his founder status. Shortly thereafter, Oblon relinquished all officer, management, and employee positions with all Plaintiff-related entities then in existence. Within a few months, the Plaintiff companies then in existence made demand upon Oblon to cease certain conduct which those Plaintiff companies contended was in violation of the Founders Agreement. Oblon did not cease, which led to more formal negotiations between those Plaintiff companies and Oblon. Those negotiations culminated in the execution of a new Settlement Agreement dated July 26, 2019, in place of the prior Founders Agreement. Again, within a few months, additional disputes arose between the existing Plaintiff entities and Oblon which resulted in substantial litigation against Oblon (and Oblon instituted litigation against his other co-founder of Elepreneurs). The settlement of those lawsuits occurred on February 28, 2020, pursuant to the terms of a Multi–Party Settlement Agreement ("MPSA"). Again, within months, Plaintiffs Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. determined and alleged that Oblon was and is actively violating the various non-competition, non-solicitation, and non-disparagement terms of the MPSA. As a result, in December 2020, Plaintiffs Sharing Services, Elepreneurs Holdings (n/k/a Elevacity Holdings), and Elepreneurs U.S. (n/k/a Elevacity US) commenced an arbitration action against Oblon before the AAA, as required by the express terms of the MPSA. That arbitration case is on-going.

28.     Defendant Amplifei was formed on or about March 16, 2020. The CEO and founder of Defendant Amplifei is Robert Oblon. The President of Defendant Amplifei is Laura A. Harte, the spouse of CEO/founder, Robert Oblon.

29.     Defendant HAPInss was formed on or about June 24, 2020.  The CEO and founder of Defendant HAPInss is also Robert Oblon.  The President of Defendant HAPInss is J. Larry Cantrell.  Mr. Cantrell is a former consultant to Plaintiff Sharing Services, hired by Robert Oblon.[4]

30.     Amplifei and HAPInss are sometimes collectively referred to herein as "Defendants."  Like Plaintiffs, Defendants promote the sale of health, wellness, and happiness nutritional supplement products on their website.  Businesses run on ideas formulated as a formal or information business plan.  Businesses own these ideas when developed by employees paid to develop business plans and marketing strategies.

31.     The Defendant entities are being used by Oblon to replicate Plaintiffs' business plan and operations through an array of misappropriation of trade secrets comprising confidential, proprietary information belonging to Plaintiffs.  Most specifically, Oblon as the former Chairman of the Board of Directors, and founder, key principal and CEO of Elepreneur, LLC (which is the predecessor entity by name change of Plaintiff Elepreneurs U.S., LLC) and in such capacities and roles possesses intimate knowledge of Plaintiffs' trade secrets and proprietary information that Oblon gained due to his former executive status and employment relationship with Plaintiffs which he has imparted to Defendants.

32.     Similarly, Defendants have made extensive use of Plaintiffs' trade secrets and proprietary information based on information learned from Plaintiffs' distributor network (which is described in greater detail below) which distributors Defendants have actively sought –

---

[4] At one of the distributor conventions of Plaintiff Elepreneurs, LLC (now known as Elepreneurs U.S.) in 2019, Oblon announced Mr. Cantrell as the new President of Elevacity, LLC, a wholly owned subsidiary of SSGC.

successfully – to convince to leave Plaintiffs and serve instead as distributors for Defendants. These actions have resulted in not just a breach of these distributor agreements with Plaintiffs in a manner which causes direct harm to Plaintiffs' business, but also an improper dissemination of Plaintiffs' intimate business operations, customers/distributor lists and know-how.

33.     The trade secret proprietary information misappropriated by Defendants through Oblon and/or Plaintiff Elepreneurs U.S.'s former distributors, includes, but is not limited to: (i) the identity of Plaintiffs' most active and financially successful distributors (and their down line network of additional distributors); (ii) most financially successful products and the associated pricing structure of the products; (iii) collaborative contributions of Plaintiffs to Plaintiffs' product formulas manufactured under the MSA with Alt Labs; and (iv) Plaintiffs' sales, marketing, promotional, and advertising techniques and training methodologies, which includes Defendants using Plaintiffs' former distributors as agents to obtain and utilize that information to recruit and train distributors for Defendants. The foregoing is collectively referred to herein as the "Trade Secrets".

34.     The misappropriated Trade Secrets are not only incredibly important and valuable to Plaintiffs as they comprise the inner workings of Plaintiffs' business organization, products, and financial information, but are also maintained in secrecy by Plaintiffs so as to be known only to necessary, high-ranking employees and executives (including Defendants' CEO Robert Oblon) or product distributors who have confidentiality obligations to Plaintiffs.

### *Unique Attributes of the Network Marketing Business Model*

35.     Plaintiff Elepreneurs U.S. and Defendants both sell their respective product lines by means of a "network marketing business model."  The network marketing business model,

especially in connection with the sale of nutritional supplement products, is uniquely characterized, by the use of independent contractor "distributors" as the sales force.

36.     The predominant communication mode for product distributors in the network marketing industry is by a variety social media platforms, primarily Facebook, Facebook Messenger, TikTok, Twitter, YouTube and Pinterest.  While text and email communications are also utilized, the use of social media platforms is central to the success and impact of the business conducted by these independent contractor distributors, as well as personal "face-to-face" marketing.

37.     The distributors of a nutritional supplement network marketing company engage in two primary functions: (i) the sale of the applicable nutritional supplements product line and (ii) the recruiting of additional individuals into a "distributor system" to further promote and sell products and services to an increasing network of customers and distributors.

38.     This distributor system network creates an upline and downline organizational structure whereby successful distributors can develop substantial downline distributor networks of many individuals who, in turn, replicate this model in their own respective downline group of distributors (this system is commonly referred to as a "distributor network"). The distributors in this system who develop a distributor network of this nature, receive a "royalty" or "commission" payment based on sales of products sold by the members of that downline distributor network to consumers.

39.     Network marketing companies, such as Plaintiff Elepreneurs U.S., invariably invest considerable time, money and resources in developing and protecting their business, culture, and community of distributors in order to foster and grow a successful, collaborative and valuable business model and community of distributors.  As a result, the departure of any distributor from

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*                                                      Page 12 of 65
28820474v.1

a network marketing organization can have substantial adverse effects, on a geometric progression basis, due to the loss of product sales and revenue generation from upline and downline distributors.

40.     The loss of a successful distributor at the top of a distributor network results in two potentially significant adverse consequences to a network marketing company: (i) the loss of product sales that would otherwise be generated by that departed distributor, and (ii) the loss of the additional new downline distributors that the departed distributor would have continued to enroll in the building and expansion of that distributor's network.

41.     The network marketing business model is a proven, successful business system. Its success is largely attributable to the myriad of enthusiastic and hard-working individuals who make up the network of distributors.  However, this business model is also unfortunately subject to duplicitous and deceptive conduct by a competitor who wrongfully seeks to poach distributors away from their existing network marketing company.

42.     Once a distributor terminates their relationship with their existing network marketing company and signs up with a competing network marketing company, the prospect of that distributor returning to the original company is highly unlikely. The very nature of the logistics, financial "pay-out" rules and person-to-person recruiting structure of a network marketing system makes it difficult for a distributor to return to a prior network after deciding to leave one company to create a new network or competing network.

43.     More specifically, the pay-out system in network marketing is based, in part, on earning commissions from sales to customers of distributors who are personally enrolled or placed by other distributors within a particular distributor network (*i.e.,* downline distributors). A distributor personally enrolls and builds his/her own sales organization, which is at different

placement levels below the original sponsor; as this system continues to grow, multiple downline levels develop, resulting in a structure in which an upline original sponsor earns a commission based on the sales volume of the downline distributors in that particular distributor network.

44.     What makes it difficult for a distributor to return to the original company once he/she has resigned their position in a distributor network "downline system", is that the entire remaining members of that distributor network move up to fill the vacancy (*i.e.,* commission spots are filled automatically when someone leaves the organization). Hence, the spot in the distributor network that the departed distributor occupied at the time of their resignation is no longer available - should the distributor seek to return to the original company.

45.     These features of the system make it difficult for a distributor to return to a prior network company after deciding to leave to create a network with a competitor because when the distributer returns, he/she will have lost their former position and rank within a downline network. The returning distributor will be starting over from scratch to build and sponsor a new downline network of distributors as the spots below that distributor's old structure would be filled and not available. As a consequence, rebuilding a distributor network takes time and effort before the prior income stream might one day be re-established for the returning distributor.

46.     Given the high probability of this draconian result, a successful distributor in a network marketing company would not ordinarily voluntarily leave his/her company in order to join a competing network marketing company absent the prospect of significant financial success. The perception of personal financial success through a network marketing distributorship is substantially based upon one's belief that the new company has the rights to sell a particular groundbreaking or highly sought-after product.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 14 of 65

47.     One such example involves Defendants' repeated false and deceptive marketing campaign claiming that they have "The Original Coffee" product that was previously developed for, licensed to, and sold by Plaintiffs.  Defendants' deceitful marketing campaign was, and is, an incredibly strong lure for Plaintiffs' distributors who earned substantial incomes from the sales of Plaintiffs' original coffee products prior to time that the FDA prohibited the continued use of a key formula ingredient.

48.     As a result, when a distributor of a network marketing company is induced to leave and join a competing network marketing business, the loss of revenue by the former company cannot be adequately quantified due to the structure of the network marketing business model, as described above.  When high ranking distributor with a large sales volume, who has a substantial downline network of distributors, leaves to join a competitor's network marketing company the loss of sales revenue is absolutely certain, however, it is impossible to calculate and quantify the amount of the lost future revenue stream. Again, not only has the original company lost members of an existing distributor network, but the company has lost the additional new distributors that the existing network would have continued to build and those corresponding additional sales.

### *Defendants' Conduct Hijacking Plaintiffs' Key Products, Intellectual Property, Marketing Concepts, Distributors, and Customers*

49.     On January 24, 2020, when Defendants' founder and CEO, Oblon, procured the website domain of www.hapinss.com he set in motion the first step leading to the formation of the two Defendant companies.  Defendants appear to have implemented a carefully orchestrated campaign to lure away distributors, and thereby also the customers, of Plaintiffs through false claims and misrepresentations involving several important nutritional supplement products of Plaintiffs (the formulas of which were exclusively licensed to Plaintiffs from Alt Labs).

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 15 of 65

50.     The Products targeted by Defendants' campaign to lure away Plaintiffs' customers and distributors are: (i) Elevate Smart Coffee™ and Elevate Nitro® Coffee, (ii) Elevate Max®+ nootropic capsules and (iii) Hemplevate™ (a liquid based hemp product).

51.     Defendants' campaign to lure away Plaintiffs customers and distributors involves:

(i)     marketing activities that falsely convey the message to Plaintiffs' distributors  and customers, and to potential customers, to the effect that Defendants had procured the formula and right to manufacture "The Original Coffee" product, which was a clear message to Plaintiff Elepreneurs U.S.'s distributors and customers that Defendants would be selling the highly desired *original* coffee product previously sold by Plaintiff Elepreneurs U.S.; and

(ii)    the replication of two other key products of Plaintiffs' Elevacity Product Line, namely, Elevate Max®+ and Hemplevate™.

### *Defendants Appropriate Plaintiffs' "Original" Elevate Smart Coffee™ and Elevate Nitro® Coffee*

52.     Plaintiff Elepreneurs U.S. currently sells three coffee products (in powder mix form): (i) Elevate Smart Coffee™, (ii) Elevate Nitro® Coffee and (iii) Elevate Max® Happy Coffee. Plaintiff Elepreneurs U.S. has sold the Elevate Smart Coffee™ product under the exclusive rights granted to Plaintiffs under the MSA from 2017 to present.  All three products are manufactured and sold by Plaintiffs pursuant to exclusive rights granted to Plaintiffs under the MSA with Alt Labs.

53.     The coffee products sold by Plaintiff Elepreneurs U.S. which are germane to this case: (i) primarily involve Elevate Smart Coffee™ and (ii) to a lesser extent, also involve Elevate Nitro® Coffee.

54.     From May 2018 through the present, Elevate Smart Coffee™ has been sold by Plaintiff Elepreneurs U.S. (f/k/a Elepreneur, LLC).  In March 2019, Plaintiff Elepreneurs U.S.

began selling Elevate Nitro® Coffee. Both original versions of these two products, Elevate Smart Coffee™ and Elevate Nitro® Coffee, contained, as a product ingredient, a constituent component commonly known as DMHA, or more specifically "2-Amino-5-Methylheptane" ("2-Amino-5"). The 2-Amino-5 constituent component banned by the FDA was one of the material ingredients within the formula of Plaintiffs' "original coffee" (Elevate Smart Coffee™ and Elevate Nitro® Coffee) (collectively "Plaintiffs' Original Coffee Products").

55.    This original version of Elevate Smart Coffee™ was an extremely successful product which generated considerable revenue for Plaintiffs from its inception in 2017 until April 2019, due largely to both the taste and efficacious benefits of this original version.  Plaintiff Elepreneur U.S.' original Elevate Smart Coffee™ product generated revenue for Plaintiff Elepreneurs U.S. in excess of $39.9 Million for the period of May 2018 (when it was launched) to the end of November 2019 (when inventory of that product was exhausted).

56.    Plaintiff Elepreneur U.S.' original Elevate Nitro® Coffee product generated revenue for Plaintiff Elepreneurs U.S. in excess of $6.8 Million for the period of March 2019 (when it was launched) through the end of December 2019 (when inventory of that product was exhausted).

57.    Those considerable sales resulted in corresponding substantial commission income to the distributors within Plaintiffs' distributor networks that sold Plaintiffs' Original Coffee Products.  For example, in 2019, aggregate commission income paid to the distributors of Plaintiff Elepreneurs U.S. from the sale of the original Elevate Smart Coffee™ exceeded the sum of $13.8 Million; and commissions attributable to the sale of the original Elevate Nitro® Coffee exceeded the sum of $3 Million.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 17 of 65

58.     At the time of the development of Plaintiffs' Original Coffee Products, Defendants' founder and CEO, Robert Oblon, was acting as the CEO of Elepreneur, LLC (n/k/a Plaintiff Elepreneurs U.S. by virtue of filings with the Texas Secretary of State).  During that time, Oblon had access to all information related to the MSA with Alt Labs for all of Plaintiffs' coffee products (embodied in various chemical compound iterations), including both of Plaintiffs' Original Coffee Products (i.e., Elevate Smart Coffee™ and Elevate Nitro® Coffee).

59.     In April 2019 (the same month Robert Oblon forcibly resigned from Sharing Services), the United States Food and Drug Administration ("FDA") prohibited the use of 2-Amino-5 as a product ingredient in dietary supplements. [5]  As a result of this FDA ruling, Alt Labs changed the formula of the Elevate Smart Coffee™ product by removing the prohibited 2-Amino-5 ingredient.

60.     The subsequent formulations of Elevate Smart Coffee™ contained a substitute constituent component for 2-Amino-5, and while it continues to be a successful product for Plaintiffs, it did not generate the same level of revenue or – importantly – the same acceptance among Plaintiffs' distributors and customers as the original formula.  More specifically, the sales revenue from Plaintiffs' reformulated coffee products only generated approximately 46% of the revenue for Plaintiff Elepreneurs U.S. as compared to the performance of Plaintiffs' Original Coffee Products (which contained 2-Amino-5).

61.     As a consequence, the distributors of Plaintiff Elepreneurs U.S. similarly experienced a corresponding substantial drop in related commissions. The distributor networks of Plaintiff Elepreneurs U.S. were keenly aware of the tepid acceptance by customers of the

---

[5]     *See*   https://www.fda.gov/food/cfsan-constituent-updates/fda-acts-dietary-supplements-containing-dmhaand-phenibut. There are twelve 2-Amino-5 compounds prohibited by the FDA. Per the FDA website, the DMHA acronym is also a common designation for these 12 prohibited 2-Amino-5 compounds.

reformulated coffee products and the resulting material decrease in the distributors' sales along with the corresponding decrease in their commissions.

***Defendants´ False Marketing Campaign Claiming To Have "The Original Coffee"***

62.     Starting in or about December 2020, Defendants began to promote the anticipated sale of a coffee product with various advertisements, including utilizing the hashtag "# The Original" next to a depiction of a cup of coffee, picturing a product labeled "AMP THE ORIGINAL COFFEE," containing the term "with 2amino5," as shown below.



63.     Defendants engaged in a substantial and conspicuous advertising campaign through their CEO, his wife and Defendant Amplifei's President, Laura Harte, and Defendants' distributors (many of whom were former distributors of Plaintiff Elepreneurs U.S.), on social media through numerous posts and videos consistently utilizing the above pictures and the terms "The Original Coffee", "2amino5", while concurrently proclaiming things like "it's ***BACK!!***," "like an old friend," "it's like a family reunion," "*The original benefits I loved in 2018* [two years before

Defendants were formed][6] *are BACK and better than ever!! So glad I found this new company!!!!,"* "*This Coffee. How I've missed those original benefits I got back in 2018*" [two years before Defendants were formed], and even "*The Original Coffee Launching March 1, 2021.*" [Misleading and deceptive representations as actual 2-Amino-5 compounds used in Plaintiffs' original coffee formulae is a prohibited ingredient for use in dietary supplements by the FDA].

64.     For example, as part of Defendants' marketing campaign claiming to have "The Original Coffee," on or about December 19, 2020, Laura A. Harte (Oblon's wife), acting as the President of Defendant Amplifei, posted on social media, an advertisement photo of Ms. Harte and an associate, Michael Garcia[7], holding up a canister of a product with the words on the container label apparently intentionally blurred.  The Post includes: (i) the hashtags: #theoriginalcoffee; #HapinssBrands, #Amplifei displayed above the photo image; and (ii) the word "The Original Coffee" in large letters displayed above the photo image. *See* **Exhibit 1** attached hereto.

65.     In late-February 2021, Defendant Amplifei furthered its marketing campaign for "The Original Coffee" with the additional advertisement below indicating that its coffee products were "featuring 2amino5" and go so far as to suggest that this composition amino-blend stack is "trademarked" (a statement which is incorrect and misleading) and part of the forthcoming launch of "The Original Coffee" it had been advertising for some months.

---

[6] This reference to a coffee product from 2018 is two years before Defendant Amplifei was even formed and thus clearly references Plaintiffs' Elevate Smart Coffee™ product.

[7]  Michael Garcia is a former distributor of Plaintiffs, now a distributor for Defendants, and is currently engaged in disputes with Plaintiffs.



66.    The following was taken from Defendants' website on March 5, 2021, as evidence

of this continued campaign:

Amped is what we call "The Original Coffee™", our trademarked and proprietary formula that brings you that original feeling you once knew and have been craving. Amped™ is our very first HapiTropic™ infused coffee.

67.    Defendants' advertising campaign was clearly designed to: (i) capitalize on the

success of the <u>original</u> version of Plaintiffs' Elevate Smart Coffee™; (ii) falsely claim a

designation of origin to Plaintiffs' <u>original</u> version of the Elevate Smart Coffee™; and (iii) misappropriate all of the applicable Branding Indicia, goodwill, and other valuable intellectual property rights inherent in and associated with Plaintiffs' existing Elevate Smart Coffee™ product. In addition, the use by Defendants of the 2amino5 designation is a calculated attempt to confuse the consuming public given the fact that Plaintiffs <u>original</u> version of the Elevate Smart Coffee™ product contained a "2-Amino-5" compound.[8]

68.     A sample of a much larger universe of social media posts (discussed in greater detail below) from some of Defendants' surrogates on March 3, 2021 about Defendants' coffee product are:



***Defendants´ Marketing Campaign Involves Several of Plaintiffs´ Former Distributors***

69.     Defendants' false and misleading representations about having "The Original Coffee" product resulted in numerous Plaintiffs' distributors resigning from Plaintiffs' network and signing on as a distributor for Defendants.  Defendants are using several of Plaintiffs' former distributors in Defendants' clearly misleading marketing campaign on social media of "The Original Coffee."

***Defendants' Social Media Marketing Using Plaintiffs' Former Distributors***

---

[8]  The statement at the foregoing website excerpt is further false and misleading by stating that Defendants' "The Original Coffee" formula is "trademarked."  Formulas are not proper subject matter for trademark protection.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ

*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

70.     Several of the former distributors of Plaintiff Elepreneurs U.S., now distributors for Defendants, have carried out a campaign under the "Original Coffee" tagline, posting on social media various teaser photos of either a coffee canister, a coffee mug or other visuals prominently declaring that "The Original Coffee" was "back" and that it would be offered for sale starting on March 1, 2021.   There are numerous social media posts by former distributors of Plaintiff Elepreneurs U.S. who have now joined Defendant Amplifei.  *See* **Exhibits 1 through 6** attached hereto.

71.     As but one of many examples, Lori Ann Benson ("Benson"), following her resignation from Plaintiff Elepreneurs U.S. on December 15, 2020, became a distributor for Defendants and made false and materially misleading statements in various electronic communications on social media, which were intended to induce the distributors and customers of Plaintiff Elepreneurs U.S. to join Defendants as either a distributor or customer:

    (i)     On or about February 17, 2021, Benson posted a message on social media that stated: "The original benefits I loved in 2018 are BACK and better than ever!! So glad I found this new company!!!!."

    (ii)    On or about January 12, 2021, Benson posted a message on social media that stated: "This Coffee...How I've missed those original benefits I got back in 2018."

    (iii)   On January 9, 2021, Benson posted a message on social media that stated: "The Original Coffee Launching March 1, 2021."

*See* **Exhibit 2** attached hereto.

72.     As another example, Andrea Franzeen, f/k/a Althaus ("Franzeen"), following her resignation from Plaintiff Elepreneurs U.S. on December 15, 2020, made the following false and materially misleading statements in various electronic communications on social media, which were intended to induce the distributors and customers of Plaintiff Elepreneurs U.S. to join Defendants as either a distributor or customer:

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 23 of 65

(i)      On or about February 12, 2021, Franzeen posted a message on social media an advertisement for the Original Coffee that stated: "*Its BACK and BETTER than ever!!  We have it!! and they DON'T.*"

(ii)     On or about January 27, 2021, Franzeen posted a message on social media a message that stated: "*The "crack" is almost back.haha! The OG Coffee that is!9 And trust me when I tell you it is 100 times better than ever before!*"

(iii)    On or about January 29, 2021, Franzeen posted a video on social media that stated: "*It's back. It's back. It's really back.  The Original Coffee. Cmon, let's go.*"

(iv)    On January 9, 2021, Franzeen posted a message on social media that stated: "*The Original Coffee Launching March 1, 2021.*"

*See* **Exhibit 3** attached hereto.

73.    Additionally, Lindsey Buboltz ("Buboltz"), following her resignation from Plaintiff Elepreneurs U.S. on December 15, 2020, made a false and materially misleading statement on social media, which were also intended to induce the distributors and customers of Plaintiff Elepreneurs U.S. to join Defendants as either a distributor or customer.  For example, on January 9, 2021, Buboltz posted a message on social media stating: "*The Original Coffee Launching March 1, 2021.*"  *See* **Exhibit 4** attached hereto.

74.    Also, Enrique Olazabal, following his resignation from Plaintiff Elepreneurs U.S. on or about January 19, 2021, made the following false and materially misleading statements in various electronic communications on social media, which were also intended to induce the distributors and customers of Plaintiff Elepreneurs U.S. to join Defendants as either a distributor or customer:

(i)      On or about February 12, 2021, Olazabal posted a message on social media that had a picture of a coffee container similar to that of Plaintiff Elepreneurs U.S. with handwriting on the top stated: "*The OG coffee10 is back!*"

---

9  The phrase "Original Gangster," shortened to "OG," was used by Plaintiff Elepreneurs U.S.'s distributors as a slang reference to Plaintiffs' original coffee formula during the time it was being sold before the FDA's ruling against 2-Amino-5 compounds required Plaintiffs' original coffee formula to be changed.

10  Slang reference to Plaintiffs' "original" coffee.  *See* FN 9 above.

(ii)     On or about January 23, 2021, Olazabal posted a message on social media that promoted an Amplifei/HAPInss coffee product with the hashtag "#The Original" with a picture of coffee cup and further posted "*It's back and better than ever.*"

*See* **Exhibit 5** attached hereto.

75.     As one more example, Traci Bodlak, following her resignation from Plaintiff Elepreneurs U.S. on or about December 15, 2020, made various false and materially misleading statements and posted false and materially misleading photos in various electronic communications on social media, which were also intended to induce the distributors and customers of Plaintiff Elepreneurs U.S. to join Defendants as either a distributor or customer:

(i)     A photo of Defendant's advertisement for its coffee product (bag style packaging) with the designation of "The Original Coffee" and "2amino5."

(ii)     A separate social media posting of a launch announcement for "The Original Coffee" depicting a coffee cup with the words "The Original" thereon and the announcement "Launching March 1, 2021."

(iii)     Engaged in a social media exchange with former Elepreneurs distributor (and current Amplifei distributor) Lindsey Buboltz regarding the Defendant Amplifei coffee product under the following hashtags: #therealOG and #itsbackandbetterthanbefore.

(iv)     A separate posting of a promotional flyer produced by Defendant Amplifei describing Defendant Amplifei's coffee product as "The Original Coffee."

(v)     A social media post declaring, "*First day with the OG back in my life!!! Its been way too long!*"

*See* **Exhibit 6** attached hereto.

## *Defendants' "2amino5" Deception*

76.     In addition to the actions of Defendants regarding "The Original Coffee" campaign, as set forth above, starting in or about mid-February 2021, Defendants began expanding those efforts by releasing an advance sample (and a published advertisement regarding same) of its new coffee product offering which contains a tag line of "2amino5" prominently displayed on the label. This representation is deceptive and misleading. Defendants know that Plaintiffs original coffee

products contained a stimulant compound comprised of 2-Amino-5-Methylheptane, the substance banned in April 2019 by the FDA from use in nutritional supplements.

77.     The use of "2amino5" on the label of a product being falsely touted as "The Original Coffee," appears to be a prop to mislead consumers/distributors, intended to further induce the distributors of Plaintiff Elepreneurs U.S. to make a profound financial decision to terminate their relationship with Plaintiff Elepreneurs U.S. and sign up as a distributor with Defendants premised on Defendants' falsely implanting in the minds of those distributors that Defendants now have the right to manufacture Plaintiffs' prior original coffee product which had been extremely popular with consumers and garnered Plaintiffs' distributors substantial income.

### _Present Day Order Fulfillment By Defendants_

78.     On information and belief, as recently as March 6, 2021, Defendants shipped to consumers and distributors Defendants' coffee product in a canister with the prominent tagline situated on the front of the label: "The Original Coffee."  The canister of "Original Coffee" used by Defendants appears to be the same size, dimension, look and "feel" (_i.e._ serrated lid edge) of the canister of Plaintiff Elepreneurs U.S.'s Elevate Smart Coffee™ product.





79.     Additionally, beginning on or about March 1, 2021 Defendants began accepting

orders (and have continued to accept orders) for the shipment of Defendants' "The Original

Coffee" product in a canister with the prominent tagline situated on the front of the label: "THE

ORIGINAL COFFEE."

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*                                      Page 27 of 65
28820474v.1



80.    "IT'S BAAAAACK!!!!! The best coffee that we loved in 2018…" can only be referring to Plaintiffs' original Elevate Smart Coffee™ since Defendants did not come into existence until 2020, and sales commenced in 2018 of Plaintiffs' original coffee product which was so popular as it contained the 2-Amino-5 compound which subsequently banned by the FDA in April 2019.

### *Harm to Plaintiffs Due to Defendants′ ″The Original Coffee″ False Claims*

81.    By falsely designating in the pre-launch promotions including social media posts, electronic live events, and other forums that Defendants' new product is "The Original Coffee,"

clearly implying that Defendants' coffee is the coffee previously manufactured and sold by Plaintiffs, these former distributors of Plaintiffs now acting on behalf of and for the benefit of Defendants, have been responsible for luring many distributors away from Plaintiff Elepreneurs U.S.

82.     This narrative has resulted in Plaintiff Elepreneurs U.S.'s distributors tendering their resignation and subsequently joining as distributors for Defendants under the false pretense that Defendants have the rights to manufacture and sell the original formula of Plaintiff Elepreneurs U.S.'s Elevate Smart Coffee™ product.[11]

83.     The number of distributors who have been lured away due to the conduct of Defendants and Defendants' distributors, acting at the behest of Defendants, since the start of Defendants' "The Original Coffee" campaign, which, upon information and belief, informally began sometime in November 2020, has been substantial.

84.     For example, during the time period from November 1 through February 28, 2021, Plaintiff Elepreneurs U.S. lost a total of 979 distributors. This represents a loss of an average of 8.15 distributors per day during this 120-day time period.

85.     Even if this assessment is taken from the more conservative date of December 20, 2020, a total of 638 distributors of Plaintiff Elepreneurs U.S. were lost during this 70-day period (December 20, 2020 – February 28, 2021).  During this time span of 70 days, an average of 9.11 Elepreneurs U.S. distributors were lost per day.

86.     Compared to the months of July through October 2020, a total of 450 Elepreneurs U.S. distributors left the company (representing an average loss of 3.66 distributors per day during this 123-day time period).  Based on these comparisons, Plaintiff Elepreneurs U.S. experienced a

---

[11] As well as Plaintiffs' Elevate Nitro® product.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 29 of 65

148% increase in the distributor loss rate percentage from December 20, 2020 through February 28, 2021 (i.e. starting from The Original Coffee Photo release described above) as compared to the time period of July through October 2020 (prior to Defendants' "The Original Coffee" campaign).

87.     The loss of distributors in the months following the Defendants' launch of "The Original Coffee" campaign reflects a notable trend. The loss of distributors for the time period of July 1, 2020 through February 28, 2021 are as follows:

| Time Period | | Number of Distributor Resignations |
|---|---|---|
| July | 2020 | 152 |
| August | 2020 | 106 |
| September | 2020 | 89 |
| October | 2020 | 103 |
| November | 2020 | 176 |
| December | 2020 | 297 |
| January | 2021 | 251 |
| February | 2021 | 255 |

88.     The foregoing summary underscores the magnitude of the harm caused by Defendants' campaign – which produced an initial surge of resignations in the ensuing days after Defendants' launch of its "The Original Coffee" campaign.

89.     Another meaningful metric that illustrates the harm caused by Defendants' false campaign involves a comparison of the loss rate of distributors from Plaintiff Elepreneurs U.S.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 30 of 65

The following chart shows the average daily number of distributors leaving Plaintiff Elepreneurs U.S. monthly from July 1, 2020 through March 18, 2021:

| Time Period | | Number of Distributors Lost | Average Daily Loss Rate of Distributors |
|---|---|---|---|
| July | 2020 | 152 | 4.90 |
| August | 2020 | 106 | 3.42 |
| September | 2020 | 89 | 2.97 |
| October | 2020 | 103 | 3.32 |
| November | 2020 | 176 | 5.87 |
| December | 2020 | 297 | 9.58 |
| January | 2021 | 251 | 8.10 |
| February | 2021 | 255 | 9.11 |

90.     Based on these figures, it is notable that once Defendants' false "The Original Coffee" campaign began in November 2020, the rate of Plaintiff Elepreneurs U.S.'s distributor loss similarly began to significantly increase. As shown above, starting in November 2020, Plaintiff Elepreneurs U.S. experienced a jump in the distributor loss rate from an average of 3.66 per day from July to October 2020 (prior to the initiation of Defendants' campaign) to 5.87 per day in November (during the nascent stage of this campaign) to 9.58 per day in December (when the campaign expanded and accelerated). This trend carried over into the new year with a January 2021 loss rate of 8.10 distributors per day, and in February 2021 with a loss rate of 9.11 distributors per day.

91.     Given the direct relationship between the customer and the ex-distributor's downline and upline network, the damage to Plaintiff Elepreneurs U.S. by losing even one distributor creates a snowball effect that is impossible to quantify.

92.     Additionally, given that customers are inconsistent with their purchases, month by month, Plaintiff Elepreneurs U.S. has been unable to determine the exact damage caused from the loss of each of these ex-distributors who also take their customers with them, despite good faith efforts to calculate the extent and scope of such loss.

93.     This coordinated campaign by Defendants and Defendants' distributors has had the further consequence of causing confusion with the **customers** of Plaintiff Elepreneurs U.S., resulting in the mistaken belief that Defendants have "The Original Coffee" that Plaintiff Elepreneurs U.S. formerly sold with great success.

94.     These coordinated efforts have produced the desired result of customers purchasing Defendants' products resulting in the diminution of Plaintiff Elepreneurs U.S. sales revenue by dramatic amounts.

95.     As discussed above, all sales of Plaintiff's coffee products (Elevate Smart Coffee™, Elevate Nitro® Coffee and Elevate Max® Happy Coffee) are presently sold with a non-DMHA/2-Amino-5 formula. The most successful of these 3 non-DMHA products remains the Elevate Smart Coffee™ product.

96.     **Elevate Smart Coffee™.**  The sale of the non-DMHA version of Elevate Smart Coffee™ began on November 21, 2019, and sold at the average rate of $869,309 per month through the end of 2019 [based on less than two months of sales]. The non-DMHA Elevate Smart Coffee™ sales for 2020 sold at an average rate of $444,361 per month [based on 12 months of sales]. Notably, the ten months of sales from January 1-October 31, 2020 for non-DMHA Elevate Smart

Coffee™ sales (the time period prior to Defendants false "The Original Coffee" campaign), produced an average monthly sales rate of $494,980. The non-DMHA Elevate Smart Coffee™ sales for January 1 – April 30, 2021, sold at an average rate of $178,295 per month [based on four months of sales].

97.     This trend graphically illustrates the adverse impact that Defendants' "The Original Coffee" campaign has had on Elevate Smart Coffee™ sales-on a monthly basis metric: dropping from $869,309 per month in 2019, and $444,361 per month in 2020, (a 48.8% drop). And, for the time period of January 1 – April 30, 2021, average sales hit a rock bottom $178,295 per month. This represents a 64% drop in average monthly sales of Elevate Smart Coffee™ of $494,980 for the time period of January 1-October 31, 2020 (prior to the Defendants' false "The Original Coffee" campaign) compared to the first four months of 2021, which produced average monthly sales of $178,295 (coming on the heels of the launch of Defendants' false "The Original Coffee" campaign).

98.     Notably, the trend from last year to this year, for the narrow period of December 1, 2020 through April 30, 2021, reveals a similar negative financial impact on Elevate Smart Coffee™ sales. Elevate Smart Coffee™ sales from December 1, 2019 through April 30, 2020 totaled $4,489,904 as compared to sales of $899,371 for the same time period from this past December 1, 2020 through April 30, 2021. This represents a dramatic decline in Elevate Smart Coffee™ sales on a year-to-year basis of $3,590,533 (representing a 79.9% reduction), evidencing the consequences and impact of Defendant Amplifei's "The Original Coffee" campaign.

99.     **Elevate Nitro® Coffee.** Sales of the Elevate Nitro® Coffee have experienced a similar declining trend line.  From January 1 – December 31, 2020, monthly sales of this product averaged $309,924 per month.  The sales of this same product for the time period of January 1 –

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 33 of 65

April 30, 2021 averaged $117,339 per month, representing a drop of 62% in average monthly sales of this product.

100.   **Elevate Max® Happy Coffee.** Sales of Plaintiff Elepreneurs U.S.'s Elevate Max® Happy Coffee product have experienced a similar decline. Introduced on April 1, 2020, the Elevate Max® Happy Coffee generated aggregate sales from April 1-December 31, 2020 of $7,482,272, producing a monthly average sales volume of $831,363.  Sales of the Elevate Max® Coffee from January 1 – April 30, 2021 totaled $1,518,052, representing a monthly revenue generation of $379,513 per month, a 54% drop in average monthly sales of this product for the time period of April 1 – December 31, 2020.

*Defendants Appropriation of Plaintiffs' Elevate Max®+ Product*

101.   Plaintiffs developed a capsule based nootropic product in July 2020 and began marketing it on or about August 1, 2020, under the name: "Elevate Max®+".  Elevate Max®+ is manufactured by Alt Labs exclusively for Plaintiffs pursuant to the MSA.

102.   Nootropics are generally characterized as products which have positive impacts on mental skills, alertness, memory and mood.  While nootropic products typically include various ingredients, it is rare for the ingredients of caffeine, synephrine, yohimbine and L-Theanine to be combined in the same product.

103.   Elevate Max®+ has a unique, propriety blend of ingredients (or "constituent components") including, among others:  caffeine, synephrine, yohimbine and L-Thenine. Alt Labs, Plaintiffs' manufacturing source as established in the MSA, is the only manufacturer known to Plaintiffs to manufacture a product which includes this unique "fingerprint" combination of these four (4) constituent components.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 34 of 65

104.    In September 2020, approximately 45-days after Plaintiffs began selling its Elevate Max®+, Defendants began offering for sale a nootropic product under the name "HapiCaps." As discussed in further detail in the section titled "The Parallel Copying of Plaintiffs 'Happiness' Business Identity" below, the "Happy" designation by Defendants is an additional action co-opting the historic business theme of Plaintiffs' operations. Since its inception in 2017, Plaintiffs have used the term "Happy", "Happiness" and other "Happy" related designations as key identifiers of its business and products, a fact that former CEO Robert Oblon knows quite well.

105.    HapiCaps contain remarkably similar combinations of constituent components as Elevate Max® + - most notably the highly unique combination of caffeine and L-Theanine. HapiCaps is also sold via a capsule delivery system like Elevate Max® +.

106.    A true and correct copy of the label for Elevate Max® + found at https://elevacity.com/details/345/happycoffeegroup appears below:



107.    The listed ingredients for Elevate Max® + are:

Alpinia Galanga Extract (as EnXtra®), Phenylethylamine HCI, Caffeine, L-Theanine, Guarana Extract, Rhodiola Rosea Extract, A-GPC (Alpha-Glycerylphosphorylcholine), p-Synephrine HCI, Griffonia Simplicifolia Extract, Bacopa Monnieri Extract, Green Tea, Green Coffee Bean Extract, Yohimbine HCI, Cocoa Bean Extract (as Cocobuterol™)

108.    A   true   and   correct   copy   of   the   label   for   HapiCaps   found   at
www.hapinss.com/details/11/amplifeistart,  appears below:



109.    The listed ingredients for HapiCaps are:

Caffeine Anhydrous, Infinergy™ (dicaffeine Malate), p-Synephrine HCL,
Yerba Mate Leaf Extract, Yohimbine HCL, L-Theanine, panax Ginseng
Extract, Rosemary Leaf Powder, Eleuthero Root Extract, Cayenne Pepper
Fruit Powder, BioPerine® (Black Pepper Extract), Vegetarian Capsule,
Calcium Silicate, Silicon Dioxide, Magnesium Stearate.

110.    Both products contain the same stimulant ingredients of caffeine, synephrine and

yohimbine, as well as the amino acid analog L-Theanine which is a calming agent. Yohimbine is

most commonly used in products associated with erectile dysfunction treatment and is rarely used

in nootropic products, although it is often used in other products within the nutritional supplement

industry.  Based on information and belief, yohimbine is used for this type of nootropic product

by only one manufacturer, that being Alt Labs.

111.    Given these facts and circumstances, it is clear that HapiCaps was developed by

Defendants by infringing upon Plaintiffs' propriety rights in Elevate Max® + either by interference

with Plaintiffs' exclusive licensing rights under the MSA with Alt Labs (and misappropriating

those rights) or via reverse engineering of HapiCaps from samples of the Elevate Max® + product.

***Defendants Appropriation of Plaintiffs' Hemplevate<sup>TM</sup> Product***

112.    Plaintiff Elepreneurs U.S. began selling a hemp based product under the name "Hemplevate <sup>TM</sup> " in August 8, 2019. [12]  Hemplevate™ is manufactured by Alt Labs exclusively for Plaintiffs pursuant to the MSA.

113.    On or about August 2020, Defendants began offering for sale a product marketed under the name "Hemplifei", also a hemp based product.

114.    Defendants marketing and sale of the Hemplifei product is a virtual copy of the Hemplevate <sup>TM</sup> product sold by Plaintiff Elepreneurs U.S. including a nearly identical name as well as strikingly similar constituent components, tastes, and application methodologies (i.e. dropper delivery systems).

115.    Several key factors denote Defendants' copying of Plaintiffs' Hemplevate™ product: (i) liquid form with a dropper delivery system; (ii) hemp-based product; (iii) the word "hemp" in the name; (iv) the word "hemp" comprising the first 4 letters of the product name; (v) mint flavor; (vi) a three-syllable name pronunciation; and (vii) the word "Hemp" on the front of the label is denoted by a color distinct from the remainder of the product name.

116.    The following product pictures demonstrate Defendants' replication for Defendants' Hemplifei product of Plaintiffs' specially developed packaging design used for Plaintiff's Hemplevate™ product.

---

[12]  Plaintiff Elepreneurs U.S. has temporarily halted the sale of its Hemplevate product due to the various restrictions imposed by state authorities regarding the sale of hemp-based products. Its current business plan calls for the resumption of sale of this product, pending clarification of the regulatory environment.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ

Visual Sample Of Plaintiffs' Hemplevate™              Visual Sample Of Defendants Hemplifei

     

117.    The constituent components for each of Plaintiffs' Hemplevate™ and Defendants'

Hemplifei Products are as follows:

Constituent Components of Plaintiffs' Hemplevate™ Product





Constituent Defendants Hemplifei  Product



118.     Hemplevate <sup>TM</sup> is manufactured by Alt Labs exclusively for Plaintiffs pursuant to the MSA.

119.     The list of ingredients for Hemplevate <sup>TM</sup> are:

Soluble Full-Spectrum Phytocannabinoid Extract Blend (Water, Olive Oil, Industrial Hemp Oil Extract, Natural Flavor, Echinacea Angustifolia Extract, Flax Seed Oil Extract), Water, Xylitol, Natural Flavors, Malic Acid, Stevia Leaf Extract, Potassium sorbet (sic) [Sorbate], Sodium Bonzoate (sic) [Benzoate].

120.     The list of ingredients for Hemplifei are:

Water-Soluble Cannabinoids From Full-Spectrum Hemp Extract, Purified Water, Xylitol, Natural Flavors, Coconut Oil, Malic Acid, Potassium Sorbate.

121.    As shown in the table below, the sole essential and efficacious constituent components, active ingredients, of Hemplevate™ and Hemplifei are identical:

| SOLE ESSENTIAL AND EFFICACIOUS CONSTITUENT COMPONENT LIST HEMPLEVATE ™ | SOLE ESSENTIAL AND EFFICACIOUS CONSTITUENT COMPONENT LIST Hemplifei |
|---|---|
| Water-Soluble Full-Spectrum Phytocannabinoid Extract Blend | Water-Soluble Cannabinoids From Full-Spectrum Hemp Extract |
| Purified Water | Purified Water |
| Xylitol | Xylitol |
| Natural Flavors | Natural Flavors |
| Malic Acid | Malic Acid |
| Potassium Sorbate | Potassium Sorbate |

122.    The other constituent components in the Hemplevate™ product (for example, Stevia Leaf extract and Sodium Benzoate) and the other constituent components in the Hemplifei product (for example, Coconut Oil) are:

(i)      Non-essential components;

(ii)     Appear only in trace amounts in the respective products; and

(iii)    Are functionally irrelevant (i.e. as to the product composition, efficacy, and pharmacological impact).

123.    Based on information and belief, the only purpose of including the Coconut Oil component in the Hemplifei product is for:

(i)      marketing purposes and/or

(ii)     to create the illusion of a distinction from the composition of other existing products, including the Hemplevate™ product.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 40 of 65

124.    Given these facts and circumstances, it is clear that Hemplifei was developed by Defendants by infringing upon Plaintiffs' propriety rights in Hemplevate™ either by interference with Plaintiffs' exclusive licensing rights under the MSA with Alt Labs (and misappropriating those rights) or via reverse engineering of Hemplifei from samples of Hemplevate™.

125.    In addition to the foregoing, Defendants have infringed upon the trademark rights of SHRG IP in its Hemplevate™ trademark which is pending registration conferral by the USPTO on the Principal Register. [See ¶ 171 below].

***The Parallel Copying of Plaintiffs ″Happiness″ Business Identity***

126.    Since the inception of Plaintiff Elepreneurs U.S. business operations (known at that time as "Elepreneur" or "Elepreneurs") in May of 2018, and continuing thereafter, Plaintiffs have used the term "Happy", "Happiness" and other "Happy"- related designations as key identifiers of its business and products. This is a fact that Plaintiff Elepreneurs U.S.'s former CEO and founder, Oblon, knows quite well. Plaintiff Elepreneurs U.S.' uses the happiness concept as an overarching theme continues to this day.

*Example of Plaintiff Elepreneurs U.S. ˝Happy˝ Products/Concepts (Circa 2019 To Present)*



127.    In March 2021, Defendants co-opted the historic business theme of Plaintiffs' operations using the "Happy" and "Happiness" concepts.

*Example of Defendants´ ˝Happy˝ Products/Concept (Circa March 2021)*



First Amended Complaint – Case No. 4:21-cv-00183-SDJ

*Sharing Services Global Corporation et al. vs.
AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 42 of 65

### _Plaintiff Elepreneurs U.S. "Happy"/ "Happiness" Conventions_

128.    This Happy/Happiness branding concept has been utilized by Plaintiffs in connection with its distributor conventions since **February 2019**. The following two images are from **Plaintiffs** "Happiness Experience" convention held in February 2019; more than a year before either Defendant existed.  These two images show Defendants' CEO/founder, Robert Oblon, standing on the stage at Plaintiff's "Happiness Experience" convention at a time when Oblon was the CEO of Plaintiff Elepreneurs U.S.:





129.    The following two photographs are from <u>Plaintiff Elepreneurs U.S.'s "Happiness Elevation" convention</u> held in **<u>October 2019</u>**; almost six months before either Defendant company was created:





First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 44 of 65

*__Defendants´ ˝The Happiness Convention˝__*

130.    The following is a picture from the website of Defendant Amplifei promoting its "The Happiness Convention," **in 2021**.



*__Admission by Defendants' CEO/Founder that Plaintiffs are ˝The Happy Co.˝__*

131.    Notably, Defendants' CEO/founder, Oblon, admits that "The Happy Co." is a business concept of Plaintiffs by virtue of the fact that he listed his credentials on his Facebook page as "*Former Founder At The Happy Co.*"  *See* **Exhibit 7**, Oblon's Facebook page.

132.    THE HAPPY CO. is the formal registered assumed name designation of Plaintiffs Elepreneurs Holdings and Elepreneurs U.S.

*__Statements By Defendants' CEO/Founder About Harming Plaintiffs' Business__*

133.    Based on Facebook page purporting to be that of Defendants' CEO/Founder Robert Oblon, Oblon has made certain not so subtle threats regarding his animus toward the Plaintiffs. For example, on February 13, 2021, Oblon posted the statement: "*I'm coming for ever (sic) thing they took from our family . . .*" with a lion aggressively tearing at its suit while roaring.  Leaving no doubt as to his motives and state of mind, Oblon (Defendants' CEO/Founder) posted the same photo and statement (but this time correcting only a portion of the erroneous syntax) on April 20, 2021: "*I'm coming for every thing (sic) they took from our family . . .*" with the same lion photo.

This is further evidence that Defendants' actions are not accidental or isolated, but are instead part of an orchestrated scheme to harm Plaintiffs and its business. *See* **Exhibit 8**, Oblon's Facebook.





First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 46 of 65

134.    Defendants have misappropriated and utilized Plaintiffs' proprietary and intellectual property rights in Plaintiffs' Elevate Max® +, Hemplevate™ and Elevate Smart Coffee™ products through the marketing and sale of, respectively, Defendants' HapiCaps, Hemplifei, and "AMP THE ORIGINAL COFFEE" products (and "The Original Coffee" marketing and promotion campaign) without obtaining a license from, or the permission of Plaintiffs, to the detriment of Plaintiffs' business operations.

135.    Thereby Defendants, each founded by their CEO Robert Oblon, who is the former CEO of Plaintiffs, are doing the very things that CEO Oblon is prohibited from doing directly pursuant to the terms of the "Multi-Party Settlement Agreement," dated February 28, 2020 (detailed in Footnote 3, page 8 of this First Amended Complaint).

## CAUSES OF ACTION

### COUNT I:

### Claims by Plaintiffs Elepreneurs U.S. and SHRG IP for Violations of Section 43(a) of the Lanham Act

136.    Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

137.    Defendants have violated Section 43(a) of the Lanham Act, Title 15 United States Code § 1125(a)(1)(A) and (B) ("Section 43(a) of the Lanham Act"), by false association and false advertising.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014) ("Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B).").

138.    Defendants' conduct described above constitutes: a false designation of origin; a false or misleading description of fact; and a false or misleading representation of fact which: (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or

association of Defendants with Plaintiffs or its products, or as to the origin or sponsorship of Defendants' goods, services or commercial activities with Plaintiffs' products, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of Defendants' goods, services, or commercial activities.  *See* § 1125(a)(1)(A) & (B).

139.    Defendants' use in commerce of the phrases "HapiCaps," "Hemplifei" and "The Original Coffee" as well as the cumulative effect of Defendants' copying/replication/conversion of Plaintiffs' Branding Indicia, ingredient lists, trade dress, marketing terminology and poaching of distributors for its products in connection with the sale, offering for sale, and/or marketing of materially identical products to the same targeted clientele is without Plaintiffs' consent and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiffs, as to the origin, sponsorship, or approval by Plaintiffs' of Defendants' products or the commercial activities alleged herein.   Such acts constitute violations of Section 43(a) of the Lanham Act (§ 1125(a)(1)(A)), and Plaintiffs have been and will continue to be injured as a result.

140.    Defendants are willfully and intentionally trading on Plaintiffs' reputation and the success of Plaintiffs' products described above, for example with respect to the "original" version of Plaintiffs' Elevate Smart Coffee product, to cause confusion as to the source and ownership of such products and associated rights to same.

141.    Moreover, Defendants' representations that its "The Original Coffee" product includes "2amino5" (which Defendants prominently display on all of their marketing/technical materials, advertisements and coffee product labels) are false and misleading.  Defendants know that Plaintiffs' original coffee products (which success Defendants are now seeking to emulate in order to steal Plaintiffs' competing business) contained a stimulant compound comprised of 2-

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 48 of 65

Amino-5-Methylheptane, the substance banned in April 2019 by the FDA from use in nutritional supplements such as Defendants' products.  The use of "2amino5" on the label and marketing materials of a product being falsely touted as "The Original Coffee" is intended to mislead consumers/distributors not just as to the origin of the product but also as to its material properties/characteristics/qualities, namely that it contains the now-banned 2-Amino-5 compound. These misrepresentations are intended to confuse consumers into purchasing Defendants' product instead of Plaintiffs' superior products and are also used to further induce the distributors of Plaintiff Elepreneurs U.S. to  terminate their relationship with Plaintiff Elepreneurs U.S. and sign up as a distributor with Defendants.  When successful, these conversions are seemingly premised on Defendants falsely implanting in the minds of those customers/distributors that Defendants now have the ability to manufacture Plaintiffs' prior original coffee product which had been extremely popular with consumers and garnered Plaintiffs' distributors substantial income.  Such acts constitute violations of Section 43(a) of the Lanham Act (§ 1125(a)(1)(B)), and Plaintiffs have been and will continue to be injured as a result.

142.    As a result of Defendants' knowing, intentional and willful violations of the Lanham Act, Plaintiffs Elepreneurs U.S. and SHRG IP are entitled to actual and treble damages in excess of the minimum jurisdictional limits of this Court, including those damages described in 15 U. S. C. § 1117.  Accordingly, Plaintiffs seek an award of Defendants' respective profits and any actual damages sustained by Plaintiffs, as well as an enhancement of the amounts found as actual damages not exceeding three times such amounts.  15 U.S.C. §§ 1117(a) & 1117(c).

143.    Additionally, Plaintiffs seek the delivery and destruction of all articles of Defendants' improper and infringing products, marketing materials, and packaging which violate Section 43(a) of the Lanham Act as alleged above.  15 U.S.C. § 1118.

144.    Additionally, Plaintiffs seek permanent injunctive relief restraining Defendants from further violating Section 43(a) of the Lanham Act in the manners alleged above because: (a) Plaintiffs have suffered and/or will suffer an irreparable injury; (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate Plaintiffs for that injury; (c) a remedy in equity is warranted; and (d) the public interest will not be disserved by an injunction, permanent or otherwise.  15 U.S.C. § 1116(a).

145.    Additionally, upon information and belief, Defendants' alleged misconduct is willful, intentional, and/or conducted in bad faith, thereby rendering this case exceptional within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), for which Plaintiffs seek an award of its reasonable attorney fees for this action and any appeals thereof pursuant to applicable law.

## COUNT II:

### Claims by Plaintiffs Elepreneurs U.S. and SHRG IP for
### <u>Unfair Competition – Section 16 of the Texas Business and Commerce Code</u>

146.    Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

147.    Defendants' actions at issue constitute unfair competition in violation of Chapter 16 of the Texas Business & Commerce Code.

148.    Plaintiffs' product lines, including the Elevate Smart Coffee™ product, and Branding Indicia are famous, recognized and distinctive as demonstrated not only by their commercial success, but also Defendants' attempts to copy these product lines as well as Plaintiffs' Branding Indicia in an effort to undercut Plaintiffs' market to steal Plaintiffs' customers and distributors.  Plaintiffs have made use of these product lines and Branding Indicia for years resulting in millions of dollars of revenue based on nationwide and international sales, including

specifically sales in the state of Texas.  Moreover, Plaintiffs have sought (and received) federal trademark registrations for its Branding Indicia.  Plaintiffs have and continue to actively monitor and control any use of its product lines and Branding Indicia to prohibit any unauthorized or impermissible uses.  In particular, Plaintiffs have adopted a comprehensive plan for the robust protection of its intellectual property including the protection of its trademarks and Branding Indicia and thus an expansive approach is part of the ordinary course of business.

149.     Defendants' use of the phrases "HapiCaps," "Hemplifei" and "The Original Coffee" (labeled as coming "with 2amino5") as well as the cumulative effect of Defendants' copying/replication/conversion of Plaintiffs' Branding Indicia, ingredient lists, trade dress, marketing terminology and poaching of distributors in connection with the sale, offering for sale, and/or marketing of materially identical products to the same targeted clientele causes dilution of the distinctive quality of these product lines and Branding Indicia of Plaintiffs, and Plaintiffs' distinctive proprietary rights inherent in same.  Defendants' efforts are calculated to deceive the relevant consuming public into accepting and purchasing Defendants' products in the mistaken belief that they are either Plaintiffs' products, or that they are sponsored by, connected with, or supplied under the supervision of Plaintiffs.  These efforts come years after Plaintiffs began selling its superior products using the Branding Indicia and trademarks referenced herein.  Defendants' emulation of these products, Branding Indicia and trademarks is the result of Defendants' desire to disrupt and harm Plaintiffs' business by creating a likelihood that the consuming public with be confused or deceived.

150.     Defendants' actions constitute dilution, unfair competition, palming of, passing off, and misappropriation of Plaintiffs' rights under Tex. Bus. & Comm. Code, § 16.103. Defendants' actions usurp, and will continue to usurp, the goodwill and reputation earned by Plaintiffs, and

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 51 of 65

permit Defendants to readily obtain consumer acceptance of goods and services offered for sale, and to give Defendants' goods and services a quality they would not otherwise have, all at Plaintiffs' expense.

151.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages including, without limit, the loss of revenue, reputation, goodwill, and exclusivity in Plaintiffs' trademarks, in an amount to be proven at trial.

152.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages, and Defendant has been unjustly enriched and should be ordered to disgorge any and all profits earned as a result of such unlawful conduct pursuant to § 16 of the Texas Business and Commerce Code.

153.    Unless enjoined by this Court, Defendants' above-described conduct will continue to cause irreparable injury, for which Plaintiffs have no adequate remedy at law, in the nature of injury to Plaintiffs' reputation, goodwill, and trademarks, as well as confusion and deception among consumers.  Plaintiffs are entitled to injunctive relief pursuant to § 16.103(c) and/or § 16.104 of the Texas Business and Commerce Code.

154.    Defendants' acts have been and are grossly negligent, deliberate, willful, intentional, in bad faith, malicious, with full knowledge and conscious disregard of Plaintiffs' rights, with intent to cause confusion and dilution, and to trade off Plaintiffs' vast goodwill in its trademarks, making this an exceptional case entitling Plaintiffs to injunctive relief and enhanced damages and attorneys' fees as provided under § 16.104 of the Texas Business and Commerce Code and/or Texas Civil Practice & Remedies Code § 41.003.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 52 of 65

**COUNT III:**

**Claims by Plaintiffs Elepreneurs U.S. and SHRG IP for**
**<u>Misappropriation of Trade Secrets and Proprietary Information</u>**

155.   Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

156.   Plaintiffs possess and own certain Trade Secrets as outlined in detail above.  These Trade Secrets are not only incredibly important and valuable to Plaintiffs as they reflect the inner workings of Plaintiffs' business, products and financial information, but are also maintained in secrecy by Plaintiffs so as to be known only to necessary, high-ranking employees and executives (including Defendants' CEO Robert Oblon during his employment with Plaintiffs).  *World Ventures Mktg.*, *LLC v. Rogers*, No. 4:18-cv-00498, 2018 WL 4169049, at *8 (E.D. Tex. Aug. 30, 2018) ("[A]t the preliminary injunction stage, a plaintiff need not establish that a defendant actually misappropriated any trade secrets; the fact that a defendant is in a position to possibly use trade secrets is sufficient to warrant injunctive relief.").

157.   These proprietary rights were acquired by Defendants through a breach of a confidential relationship or were discovered by Defendants through improper means.  These improper means include by learning of these Trade Secrets from Defendants' CEO/Founder Robert Oblon and/or Plaintiffs' former employees and/or distributors and/or suppliers who only became aware of the Trade Secrets based on their relationship and/or employment with Plaintiffs which included various obligations, confidentiality provisions, non-compete provisions and express and/or implied duties to Plaintiffs (which Oblon has breached as set forth below based in part on the active participation of Defendants).

158.   Defendants' use of Plaintiffs' Trade Secrets did not end with Defendants simply making use of information known to or communicated by Defendants' CEO/Founder Oblon, but

instead included additional steps of systematically converting Plaintiffs' distributors over to Defendants and then using additional levels of information improperly communicated by those distributors in violation of their agreements with Plaintiffs.  In the same manner that Defendants' stole Plaintiffs upline and downline distributor network, Defendants misappropriated Trade Secrets learned based on these different tiers of distributors to reach every level of Plaintiffs' business.

159.    Defendants have utilized and exploited these Trade Secrets in order to unfairly compete with Plaintiffs by emulating Plaintiffs' business including by utilizing Plaintiffs' confidential distributor, customer, financial and product information to knowingly, intentionally, and irrevocably damage Plaintiffs' business.

160.    As a proximate cause of Defendants' misappropriation of Trade Secrets and proprietary information, Plaintiffs Elepreneurs U.S. and SHRG IP incurred and are incurring damages and are entitled to damages in excess of the minimum jurisdictional limits of this Court.

161.    Plaintiffs Elepreneurs U.S. and SHRG IP have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions.  Plaintiffs Elepreneurs U.S. and SHRG IP are entitled to injunctive relief against Defendants pursuant to applicable law.

**COUNT IV:**

**Claims by Plaintiffs Elepreneurs U.S. and SHRG IP
for Statutory Misappropriation of Trade Secrets**

162.    Plaintiffs Elepreneurs U.S. and SHRG IP incorporate by this reference all of the allegations above as if fully set forth here.

163.    Plaintiffs possess and own certain valuable and secretive Trade Secrets as outlined in this Amended Complaint as well as Count III above.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ

*Sharing Services Global Corporation et al. vs.
AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 54 of 65

164.     Without consent and authorization by Plaintiffs Elepreneurs U.S. and SHRG IP, Defendants knowingly misappropriated, utilized, made copies of, communicated, or transmitted Plaintiffs' proprietary rights in and to these Trade Secrets.  This includes, but is not limited to, Defendants utilizing Plaintiffs' Trade Secrets to steal or convert Plaintiffs' distributors, customers, product suppliers/manufacturers and to otherwise deliberately damage Plaintiffs' business.  These efforts have not only caused Plaintiffs millions of dollars of damages in the form of lost revenue, but have also resulted in Plaintiffs losing hundreds of distributors since Defendants began their operations.

165.     Defendants, utilizing these Trade Secrets to knowingly, intentionally, and irrevocably damage Plaintiffs' business, have engaged in the "Misappropriation" of the Trade Secrets by "Improper means," as such terms are defined by the Texas Uniform Trade Secrets Act, § 134A.001 and 134A.002, of the Texas Civil Practice and Remedies Code.

166.     Defendants' misappropriation was both willful and malicious.

167.     Plaintiffs Elepreneurs U.S. and SHRG IP were proximately damaged as a result of Defendants' conduct, and Plaintiffs are entitled to recover damages in excess of the minimum jurisdictional limits of this Court for Defendants' misappropriation, including both actual damages caused by the misappropriation, and the unjust enrichment Defendants received as a result of their misappropriation that is not taken into account in computing actual damages.

168.     Plaintiffs Elepreneurs U.S. and SHRG IP have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions.  Plaintiffs Elepreneurs U.S. and SHRG IP are entitled to injunctive relief pursuant to applicable law.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 55 of 65

**COUNT V:**

**Claims by Plaintiff SHRG IP for**
**Common Law Trademark Infringement and Misappropriation**

169.     Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

170.     Defendants' use of the "Hemplifei" product designation constitutes common-law trademark infringement and misappropriation of the goodwill and affiliation of Plaintiff SHRG IP's trademark: "Hemplevate™".   In particular, Defendants' actions satisfy all elements of common law trademark infringement: (1) the name Plaintiff SHRG IP seeks to protect is eligible for protection; (2) Plaintiff SHRG IP is a senior user of the name; and (3) there is a likelihood of confusion between the Plaintiff SHRG IP's mark and that of Defendants. *Zapata Corp. v. Zapata Trading Intern., Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ).

171.     The "Hemplevate™ " trademark owned by SHRG IP is pending registration as a Section 1(a) federally registered trademark on the Principal Register with the United States Patent & Trademark Office ("USPTO") (15 U.S.C. § 1051(a)).  This trademark was originally filed under 15 U.S.C. § 1051(b) on an "Intent To Use" basis on January 10, 2020 (as evidenced by Serial No. 88/754316 issued by the USPTO).   This Section 1(b) application was granted a Notice of Allowance by the USPTO on December 8, 2020.  On February 18, 2021, Plaintiff SHRG IP filed a Statement of Use with the USPTO, thus clearing the final predicate to have this application considered for registration on the Principal Register of the USPTO, under Section 1(a) (15 U.S.C. § 1051(a)). Subsequent filings were made by Plaintiff SHRG IP to address final requested clarifications of this Section 1(a) application and at present this trademark is procedurally positioned for conferral of full registration status on the Principal Register by the USPTO.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 56 of 65

172.    Plaintiff's "Hemplevate™" trademark has been in use since August 8, 2019, which is well before Defendants even existed.  As such, there is no dispute that Plaintiffs are the senior users.

173.    Defendants' use of the confusingly similar "Hemplifei" name is not only strikingly similar to Plaintiff's "Hemplevate™", but Defendants have effectively emulated Plaintiff's trade dress and Branding Indicia for these products to further exacerbate consumer confusion.  As such, there is a likelihood of confusion.

174.    As a result of Defendants' common-law trademark infringement and misappropriation of the goodwill of the Hemplevate trademark, Plaintiff SHRG IP is entitled to damages in excess of the minimum jurisdictional limits of this Court.

175.    Plaintiff SHRG IP has no adequate remedy at law and is suffering irreparable injury as a result of Defendants' actions.  Plaintiff SHRG IP is entitled to injunctive relief against Defendants pursuant to applicable law.

## COUNT VI:

### Claims by Plaintiffs Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. for Tortious Interference with Contracts

176.    Plaintiffs Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. incorporate by this reference all of the allegations above as if fully set forth here.

177.    Defendants have willfully and intentionally interfered with numerous contracts and/or relationships and such interference has caused substantial and direct harm to Plaintiffs. *Community Health Sys. Prof'l Servs. v. Hansen,* 525 S.W.3d 671, 689 (Tex. 2017).

178.    Plaintiffs Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. have an existing contract with Alternative Laboratories, LLC ("Alt Labs") pursuant to that certain

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 57 of 65

"Manufacturing and Supply Agreement" dated August 27, 2018 (defined earlier in this Amended Complaint as the "MSA").

179.    Defendants were aware of the existence of the MSA between Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. and Alt Labs.  Defendants willfully and intentionally acted to interfere with the MSA by contacting Alt Labs for the primary purpose of seeking to tortiously interfere with the MSA such as to either interfere with Plaintiffs' exclusivity regarding the relevant products discussed above, interfere with Plaintiffs' supply of the relevant products and/or to gain access to Plaintiffs' product formulations to emulate those products. Despite the fact that there are numerous potential suppliers Defendants could have selected, Defendants deliberately elected to contact Plaintiffs' established and exclusive supplier of the relevant products.

180.    Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. also have existing contracts with its numerous distributors that are valid and subject to interference.  This includes, without limitation, the various distributors referenced above which Defendants have now caused to leave Plaintiffs and instead sign on as distributors for Defendants resulting in direct harm to Plaintiffs.

181.    Defendants willfully and intentionally acted to interfere with these contracts by, *inter alia*, falsely promoting the replicated "Original" Elevate Smart Coffee™ version sold by Plaintiff Elepreneurs U.S. as a product owned by Defendants under the name "The Original Coffee" which Defendants falsely designate includes the banned "2amino5" compound. Defendants knew its actions would result in the termination of the valuable contractual relationships by Plaintiff Elepreneurs U.S. and its independent contractor distributors, which in

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 58 of 65

fact, did occur as demonstrated in detail above.  This has led to hundreds of distributors leaving Plaintiffs, many of which have now been converted to distributors of Defendants.

182.    As a proximate cause of the tortious interference with contracts engaged in by Defendants as described above, Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. were injured and Defendants caused these Plaintiffs actual damage or loss in excess of the minimum jurisdictional limits of this Court.

183.    Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions. Plaintiffs are entitled to injunctive relief pursuant to applicable law.

184.    Defendants' acts have been and are grossly negligent, deliberate, willful, intentional, in bad faith, malicious, with full knowledge and conscious disregard of Plaintiffs' rights entitling Plaintiffs to injunctive relief and enhanced damages and attorneys' fees as provided under Texas Civil Practice & Remedies Code § 41.003.

## COUNT VII:

### Claims by Plaintiff Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. for Tortious Interference with Business Relationships

185.    Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

186.    Defendants were aware of the existence of business relationships between these Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S., on one hand, and on the other hand: (a) Alt Labs, and (b) Plaintiffs' distributors.

187.    Defendants have willfully and intentionally interfered with numerous of the foregoing business relationships and such interference has caused substantial and direct harm to Plaintiffs. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

188.    Through unlawful or tortious acts outlined in detail above, Defendants interfered with the relationships including by falsely contacting Alt Labs under the guise of introducing them to a new potential client but really obtaining or trying to obtain proprietary information about Plaintiffs' products and falsely promoting the "Original" coffee as a copy of Plaintiffs' product to lure customers, employees and/or distributors away from Plaintiffs.

189.    As a proximate cause of Defendants' tortious interference with Plaintiffs' Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. business relationships, Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have been damaged in excess of the minimum jurisdictional limits of this Court.

190.    Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions. Plaintiffs are entitled to injunctive relief pursuant to applicable law.

191.    Defendants' acts have been and are grossly negligent, deliberate, willful, intentional, in bad faith, malicious, with full knowledge and conscious disregard of Plaintiffs' rights entitling Plaintiffs to injunctive relief and enhanced damages and attorneys' fees as provided under Texas Civil Practice & Remedies Code § 41.003.

## COUNT VIII:
### Claims by Plaintiff Sharing Services, Elepreneurs Holdings, and Elepreneurs U.S. for <u>Knowing Participation in Breach of Fiduciary Duty</u>

192.    Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

193.    Defendants have knowingly participated in the breach of Robert Oblon's fiduciary duty to Plaintiffs.  The requisite elements for a claim of knowing participation in breach of fiduciary duty are: (1) the existence of a fiduciary relationship; (2) that the third party knew of the

First Amended Complaint – Case No. 4:21-cv-00183-SDJ

*Sharing Services Global Corporation et al. vs.
AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 60 of 65

fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship. *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018)

194.    Robert Oblon – by virtue of his prior employment relationship with Plaintiff Elepreneurs U.S. and Chairman of the Board of Plaintiff Sharing Services – has a continuing and ongoing fiduciary duty to Plaintiffs. *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 598 (Tex. App.—Amarillo 1995, no writ) (noting employee's duty not to use confidential information against employer "survives termination of employment"); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (employee may not appropriate a company's trade secrets or "carry away confidential information, such as customer lists"); *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.–Houston [14th Dist.] 2007, no pet.) (fiduciary obligation not to use trade secret information acquired during the employment relationship in a manner adverse to the employer survives the termination of the employment relationship); *NCH Corp. v. Broyles,* 749 F.2d 247, 254 (5th Cir. 1985) ("[e]ven in the absence of a contract not to disclose confidential information, an agent has a duty ... after the termination of the agency not to use or to disclose . . . trade secrets . . . or other similar confidential matters . . .[.]").

195.    Defendants – which are entities created and operated by Robert Oblon, his wife, and their associates specifically to unfairly compete with Plaintiffs and steal Plaintiffs customers and/or distributors – knew of this fiduciary relationship with Plaintiffs as well as the fact that Defendants were in possession of confidential materials that were only gained based on Oblon's relationship and employment with Plaintiffs.

196.    Nevertheless, Defendants continued to operate in a manner which violates § 43(a) of the Lanham Act, infringing on Plaintiffs' trademarks and Branding Indicia, interfering with

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 61 of 65

Plaintiffs' contracts and existing and potential business relationships, and misappropriating Plaintiffs' Trade Secrets all for the purpose of unfairly competing with Plaintiffs in order to steal Plaintiffs' market share and/or distributors.

197.    Hence, Defendants are liable as joint tortfeasors based on their knowing participation in Oblon's breach of fiduciary duty owed to Plaintiffs.

198.    As a proximate cause of Defendants' knowing participation, Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have been damaged in excess of the minimum jurisdictional limits of this Court.

199.    Plaintiffs Sharing Services, Elepreneurs Holdings and Elepreneurs U.S. have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions. Plaintiffs are entitled to injunctive relief pursuant to applicable law.

## COUNT IX:

## Declaratory Judgment

200.    Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

201.    Pursuant to 28 U.S.C. §2201 and other applicable law, Plaintiffs seek a declaration from this Court that: (i) Plaintiffs are the owners of Elevate Max®+, and Hemplevate$^{TM}$, and Elevate Smart Coffee™, (and all other related product lines and associated proprietary rights therein) ("Elevate Product Line"); (ii) Plaintiffs hold the exclusive license rights to the formulations to the Elevate Product Line (including the Elevate Max®+, Hemplevate$^{TM}$ and the Elevate Smart Coffee™ [all versions]) products under the MSA; and (iii) that Defendants have no right, title, interest or other claim to the Elevacity Product Line (including the, Elevate Max®+, Hemplevate$^{TM}$ and the Elevate Smart Coffee™ [all versions]) products (and associated Proprietary Rights) as well as the exclusive license rights described above.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 62 of 65

## COUNT X:
### Injunctive Relief

202.     Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

203.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116, § 134A.003 of the Texas Civil Practice and Remedies Code, and other applicable law, Plaintiffs seek injunctive relief against Defendants and those in active concert or participation with them.

204.     Pursuant to Eastern District Local Rule CV-65, Plaintiffs will file a Motion for Injunctive Relief, in an instrument separate from this Complaint which shall include the specific grounds for the injunctive relief requested by Plaintiffs.

## COUNT XI:
### Exemplary Damages

205.     Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

206.     Defendants acted willfully, with fraud and malice toward Plaintiffs, entitling Plaintiffs to exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

## COUNT XII:
### Attorneys' Fees

207.     Plaintiffs incorporate by this reference all of the allegations above as if fully set forth here.

208.     Plaintiffs hired the law firms of Jones, Davis & Jackson, PC and Jackson Walker L.L.P. to represent them in this matter and have agreed to pay such attorneys a reasonable and necessary fee for their services.  Pursuant to 15 U.S.C. §1117(a), §16.103 of the Texas Business

and Commerce Code, § 134A.005 of the Texas Civil Practice and Remedies Code, and other applicable law, Plaintiffs are entitled to recover from Defendants its reasonable and necessary attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Sharing Services, Elepreneurs Holdings, Elepreneurs U.S. and SHRG IP pray that Defendants AmplifeiIntl, LLC d/b/a HAPInss and HAPInssBrands LLC be summoned to appear and answer herein, and that upon final hearing, Plaintiffs have the requested relief against Defendants, as follows:

a.     for actual, consequential, incidental, statutory and exemplary damages including up to treble damages as permissible by the relevant statutes and authorities;

b.     a declaration that Plaintiffs are the owners of the Elevacity Product Line (including the original Elevate Smart Coffee™) (and associated proprietary rights therein) and the exclusive license rights under the MSA regarding the Elevacity Product Line and that Defendants have no right, title, interest or other claim to the Elevacity Product Line (including the Elevate Smart Coffee™) [all versions] product (and associated proprietary rights therein) and the exclusive license rights under the MSA;

c.     pursuant to 15 U.S.C. §1118 requiring that Defendants and all others acting under Defendants' authority at their cost, be required to deliver up to Plaintiffs for destruction all infringing or improper products, accessories, labels, signs, prints, packages, wrappers, receptacles, advertisements, and other material in their possession, custody or control which violate § 1125(a) or otherwise bear any of Plaintiffs marks alone, or in combination with any other word, words, or design;

d.     appropriate injunctive relief as may be further prayed for or requested by Plaintiffs;

e.     prejudgment interest on all eligible damage awards at the highest lawful rate;

f.     post judgment interest at the highest lawful rate;

g.     attorneys' fees and court costs; and

h.     for such other and further relief, at law or in equity, to which the Court may deem Plaintiffs to be justly entitled.

First Amended Complaint – Case No. 4:21-cv-00183-SDJ
*Sharing Services Global Corporation et al. vs.*
*AmplifeiIntl LLC and HAPInssBrands LLC*
28820474v.1

Page 64 of 65

Respectfully submitted,

/s/ *Janet Douvas Chafin*

**Janet Douvas Chafin**
Designated Lead Attorney
State Bar No. 02785200
jchafin@jw.com
**JACKSON WALKER, L.L.P.**
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone:      (713) 857-2676 cell
Fax:               (713) 308-4108 direct

**Blake T. Dietrich**
State Bar No. 24087420
bdietrich@jw.com
**JACKSON WALKER, L.L.P.**
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Telephone: (214) 953-5992 direct

**Nicole Westbrook**
Colorado Bar No. 34310
Admitted to U.S. Dist Court, Eastern Dist. TX
**JONES, DAVIS & JACKSON, PC**
15110 Dallas Parkway, Suite 300
Dallas, Texas 75248
Telephone:      (972) 733-3117
Fax:               (972) 733-3119

**ATTORNEYS FOR PLAINTIFFS**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2021, this First Amended Complaint was served on Defendants attorneys by the Court's E-filing system, and I also sent a copy of this document via email to Defendants' attorneys:

Howard J. Klatsky          via email: hklatsky@feesmith.com
Fee, Smith, Sharp & Vitullo
13155 Noel Road, Ste. 1000
Dallas, TX 75240

Thomas J. Adair            via email: tom@adairlaw.com
Adair Law, PLLC
1001 14th Street, Suite 112
Plano, Texas 75074          /s/*Janet Douvas Chafin*
                                Janet Douvas Chafin